In the Matter of the Application of BRONX PARKWAY COM-
MISSION, Appellant, to Acquire Title to Lands of FREDERICK
W. KRAFT and Others.

WILLIAM H. KRAFT and JOHN KRAFT, as Executors, etc., of
FREDERICK W. KRAFT, Deceased, and Others, Respondents.

Second Department, March 12, 1920.

**Eminent domain — erroneous award based on conjecture and
opinion — appraisal remitted to new commissioners.**

Appeal by the Bronx Parkway Commission from an order confirming the
report of commissioners of appraisal in condemnation proceedings wherein
a substantial award was made to an owner, part of whose lands was taken,
for interference with water rights which had never yet been developed,
and for the possibility of the application of the lands taken to manufacturing
purposes in the future, etc. Evidence examined, and *held*, that the award
was based upon an erroneous theory of damage derived from conjectural
estimates and opinions concerning the adaptability of the property for
certain business purposes, and that the appraisal should be reversed and
remitted to a new commission.

An owner should have the fair market value for all available uses and pur-
poses, but an inquiry as to all purposes to which the condemned property
may be applied, having reference to the existing business or wants of the
community, or such as may be reasonably expected in the immediate future,
is too broad a rule.

APPEAL by the Bronx Parkway Commission from an order
of the Supreme Court, made at Special Term and entered in the
office of the clerk of the county of Westchester on the 6th day
of November, 1918, confirming the report of the commissioners
of appraisal in condemnation proceedings begun in March, 1916.

In this order some sixty-three parcels were involved. This
appeal and the argument thereon concerned only the following
five awards:

Sheet 10, parcel 1. Amount claimed, $90,369; F. E. Kraft,
claimant. Later his executors substituted.

Sheet 10, parcel 6. Amount claimed, $837; Emil and
Albertina Wildi, claimants.

Sheet 10, parcel 11. Amount claimed, $2,500; K. E. Wart-
man, claimant.

Sheet 10, parcel 12. Amount claimed, $700; Susel Dressner
and C. Zelikowitz, claimants.

Sheet 13, parcel 52.   Amount claimed, $3,800; Margaret E. Frechette, claimant.

It appeared that Mr. Kraft had died on September 3, 1916, pending these proceedings.   A notification was handed down December 19, 1919, that there must be a revivor.   (190 App. Div. 918.)   Later, his personal representatives have been substituted *nunc pro tunc* as of September 12, 1916, by order entered herein upon consent, December 29, 1919.

*Charles H. Peck* [*Theodosius Stevens* with him on the brief], for the appellant.

*Joseph S. Wood,* for the respondents executors of the Kraft estate.

*Charles B. McLaughlin,* for the respondent Margaret E. Frechette.

*Clarence C. Ferris,* for the respondents Emil and Albertina Wildi.

PUTNAM, J.:

The Kraft award appears to be the chief subject of this appeal.   The late Frederick W. Kraft owned a considerable property for a tanning factory in the triangle between Midland avenue and the Harlem division of the New York Central railroad in Bronxville.   The Bronx river runs right through it in a curve from beneath a culvert under Midland avenue to the railroad bridge.   This land is also subject to an easement of the Bronx valley sewer, running westward of the railroad. This condemnation does not include the factory lot, or the factory building.   The factory has a pipe or trough leading from the Bronx river to an intake well.   The land condemned is a three-sided corner between Midland avenue and the railroad.   It contains one and eighty-eight one-hundredths acres, or 82,241 square feet, of which 17,200 square feet is river bed. It averages about fifteen feet below the grade of Midland avenue and that of the railroad.   Its surface is from four to six feet above the ordinary river level, but is subject to overflow in freshets.

Respondents make a claim for the special value of this part taken, and a further grievance for the damage to the remaining

factory site, not taken, in that it is cut off from the river whence it has taken its water supply.   The Kraft estate also claims that this land, especially on the sides, has many potential factory sites.   The record, however, is mainly taken up with water rights, not only those appurtenant to the owner's tanning factory, but the opportunity to put up an ice plant, or a refrigerator plant, to produce artificial ice for the supply of the people of Mount Vernon by the ammonia or like process, where fresh water is used.

The learned court at Special Term remarked in his opinion: " It may be that some of the testimony, for instance, with respect to the value of the water in connection with Parcel No. 1, Sheet 10, was incompetent and immaterial; but nevertheless I think there is sufficient relevant and competent testimony to justify the award for that parcel, as well as the other parcels that are now objected to."

This brings us to a wide divergence in damage estimates. Ex-Mayor Fiske, of Mount Vernon, called by the petitioner, estimated the market value of this parcel at $14,048.20.

Dudley F. Valentine, a Yonkers real estate dealer, estimated the market value of the entire Kraft factory property at $58,623.29, which, after taking parcel No. 1, left a value of $43,160.90, making as resulting damage $15,462.39.

The claimants' witnesses, taking as a basis the Bronx river waters and assuming that parcel No. 1 is adapted for an ice plant, have built up by conjectures (that look very speculative) a damage about fifteen times what petitioners' witnesses had stated.   Thus, William H. Cromwell, of Mount Vernon, valued the entire Kraft property at $362,715, that the part not taken was worth $127,453, leaving as damage $235,262. In a similar calculation, Frank G. Swartwout, of Scarsdale, estimated this damage at $231,501.95.   These imposing figures were reached by considerable exercise of imagination. *First*, so-called experts proclaimed how well suited this place would be for an ice plant, and how the present defects of grade might be obviated, or even the present lowlands might be taken advantage of, so as to allow cars to come down along gravity sidings from the railroad.   Then were set forth designs for a complex structure, with a money-making capacity which assumed a ready market for this ice production.   Other

industrial purposes were hinted at, but the matter of ice production, and the value of Bronx river water were chiefly stressed.  In this manner experts figured out a loss of profits by this taking of a site for a hypothetical ice plant, and the profits so capitalized took the place of the standard of market values.  Claimants' actual use of the river water is by a pipe or trough leading water to a holding tank in the tannery. In this connection, counsel for the commission on August 14, 1916, stated on the record: " I  *  *  *  am prepared at this time to stipulate that so far as the actual use of the water in the factory property is concerned, the Bronx Parkway [Commission] is willing to consent that in lieu of any damages which might, or might not, result from the taking of the Bronx river in this proceeding, the pipes or means of securing water from the Bronx river may be allowed a permanent easement so long as the factory is required for its present uses, or if the same amount of water is required for other uses, and no pollution results."

We cannot sustain this award on any suggested basis upon the other testimony.  The amount, $90,369, could not come from market value alone.  It rests on some basis of water rights.  A witness who lives in The Bronx testified that an ice plant of fifty tons daily capacity required 288,000 gallons of water to cool the condensers.  That such daily supply from the Bronx river enhanced the value of the property west of the Bronx river (that is, between the river and the railroad) to the extent of $122,000.  Yet this witness never located an ice plant on a stream as small as the Bronx.  He, however, admitted that there were several sites in this region equally suitable for an ice plant.

Another expert, from the New York Edison Company, had examined different water sites with a view of selling, as a substitute, electricity as power.  He gave his opinion that parcel 1 was adapted for an ice plant, or a refrigerating plant, principally because of the Bronx river flowing through the property.  He computed that for either a 50-ton ice plant or a 100-ton refrigerator plant, 93,120,000 gallons of water would be required for a year.

The witness Swartwout from Scarsdale pronounced this Kraft property adapted to manufacturing and business pur-

Second Department, March, 1920.            [Vol. 191.

poses, and gave as illustrations an ice plant, a rubber plant, or a gelatine factory, and other industries where large quantities of fresh water are used for manufacturing purposes. He referred to its nearness to the railroad, and figured claimant's damage at $231,501.95. This was an estimate of $1.33 per square foot for all land subject to the sewer easement, and $1.83 per foot for all the river bed. He admitted that he had not calculated the difference between the value of the factory lot with the water privileges and without. He had never sold in the Bronx valley one parcel used for manufacturing purposes.

The testimony then turned on the prospects of factory water supply from driven wells. The witness Brown, who had driven wells between the Kensico dam and Midland avenue in Bronxville, had found wells at North White Plains, Valhalla, White Plains and Lawrence Park. Having examined this Kraft parcel, he testified that he found no positive indications that would lead to the conclusion that water could be obtained there by boring deep wells. He gave a geological opinion that a barrier of rock just above this parcel crossed the valley, which cut off all descending percolating water except as the river passes through the cleft in the rock; hence that the subterranean water supply would be small. The yield from this limited watershed of 250 or 300 acres was his basis. He gave his judgment that there was nothing to lead to the belief " that you would get water by drilling in that kind of rock." This conclusion was somewhat impaired by the fact that the witness had never bored a well for water near this place and had not studied the geology of the Bronx valley. He had made no borings in this ledge, and was not acquainted with the profiles, cross-cuts and engineering work for the Bronx valley sewer.

Further testimony came from the witnesses Lupprian and Walter, giving structural details for such a supposed ice plant in view of the site and condition of this land.

Against this is the petitioner's testimony. Horace J. Campbell, who had located many factories and operated many ice and refrigerating plants, explained the latest developments in ice manufacture; the use of oil, steam and water power; the raw water system; the make-up from the cores of raw water

ice, and the use of cooling towers. This testimony is claimed to show from these later methods how speculative and precarious must be any opinion of the prospects and value of any given location for ice production. He figured the total capital investment required for a fifty-ton ice plant, exclusive of the land, as $131,841.

The question of water supply from driven wells bore on the future requirements of the Kraft tannery factory. The offer of a permanent easement for this water supply, already cited, seems to cover this point; but the petitioner proved by John A. Drew and by William M. Quimby that wells in that place would be successful, and between the brook and the the tannery.

In *Matter of Furman Street* (17 Wend. 649, 670) BRONSON, J., said: " In a case like this, the proper mode of adjusting the question of damages is to inquire, what is the present value of the land, and what will it be worth when the contemplated work is completed."

An inquiry as to all purposes to which the condemned property could be applied, having reference to the existing business or wants of the community, or such as may be reasonably expected in the immediate future (*Boom Co.* v. *Patterson*, 98 U. S. 403), has been since recognized as too broad a rule. The owner should have the " fair market value for all available uses and purposes." (*United States* v. *Chandler-Dunbar Co.*, 229 U. S. 81; *McGovern* v. *New York*, Id. 363; *Matter of Simmons*, 130 App. Div. 350; affd., 195 N. Y. 573; *City of Syracuse* v. *Stacey*, 169 id. 231; 2 Nichols Em. Dom. [2d ed.] 1171.)

The estimation of the fitness of such vacant land for building improvement, or for a commercial use, must be made real by a market value so used, to be reasonably expected in the near future, not speculative schemes of some one who proposes a new and previously untried venture. (*Chicago, Burlington & Quincy R. R.* v. *Chicago*, 166 U. S. 250; *Chicago, B. & Q. R. R. Co.* v. *Reisch*, 247 Ill. 355; *Matter of Board of Water Supply*, 189 App. Div. 20; *Orleans County Quarry Co.* v. *State of New York*, 172 id. 863; *New York* v. *Sage*, 239 U. S. 57.)

Because the testimony for the estate of Frederick W. Kraft has not been thus limited to market values, the appraisal cannot

stand.  Such speculative estimates are reflected in the award
at the rate of one dollar and nine cents per square foot in com-
parison with the awards for the other parcels.

I advise that the award to the executors of Frederick W.
Kraft be reversed, as based on an erroneous theory of damage
derived from conjectural estimates and opinions concerning
the adaptability of the property for a supposed ice or refriger-
ating plant, and, therefore, that our decision be:

Order of Special Term entered November 6, 1918, confirming
report of commissioners of appraisal dated August 26, 1918,
so far as relates to parcel 1, sheet 10, reversed, and such
appraisal remitted to a new commission, without costs.  So
far as relates to parcels 6, 11 and 12 of sheet 10, and parcel 52
of sheet 13, the order is affirmed, with ten dollars costs and
disbursements to each attorney who appeared and filed a brief
on this appeal

JENKS, P. J., RICH, BLACKMAR and JAYCOX, JJ., concur.

Order of the Special Term entered November 6, 1918, confirm-
ing report of commissioners of appraisal dated August 26, 1918,
so far as relates to parcel 1, sheet 10, reversed, and such
appraisal remitted to a new commission, without costs.  So
far as relates to parcels 6, 11 and 12 of sheet 10, and parcel
52 of sheet 13, the order is affirmed, with ten dollars costs and
disbursements to each attorney who appeared and filed a brief
on this appeal.