In the Matter of the Application of the BOARD OF TRANSPORTA-
TION OF THE CITY OF NEW YORK Acting for and on Behalf of
The City of New York, Relative to Acquiring Title to Certain
Real Property Situated and Located Generally Within and
Bounded by West Two Hundred and Seventh Street, Ninth
and Tenth Avenues, West Two Hundred and Sixteenth Street
and the Harlem River, in the Borough of Manhattan, City of
New York, for the Construction, Maintenance and Operation of
a Municipal Rapid Transit Railroad Yard.

Supreme Court, New York County, June 24, 1931.

*Arthur J. W. Hilly*, Corporation Counsel [*Josiah A. Stover* of
counsel], for the City of New York.

*Bernard Cowen* [*Robert P. Beyer* of counsel], for the claimant.

CALLAHAN, J. By a deed of trust, dated June 6, 1806, William
Nagel granted to certain trustees a part of his farm in the then
outward section of the city of New York as a burial ground for
" the benefit of his family connections, relations and friends,"
with a " burial privilege without interruption." The deed recites
the fact that the plot had been used for cemetery purposes " for
ages past." No record appears of any successors having been
appointed to the trustees named in the deed so that on their death
the trust vested in the Supreme Court. The city of New York in

1926 took by condemnation for subway purposes all of the plot so deeded. On the hearing of the matter of awards to those whose property was taken no claimant appeared with respect to this plot. The court awarded only nominal damages on the theory that by reason of the trust impressed on the land no substantial award was justified. Later one Alice Post, claiming to be an heir of William Nagel, asked for a rehearing asserting the right to substantial damages. The court granted said motion and took additional testimony mainly to determine whether or not the use of the premises for burial purposes had been abandoned. When the city took the present plot by eminent domain it purchased a plot in Woodlawn Cemetery and transferred the remains of those buried therein to such plot.

Whether the plot involved herein be deemed dedicated by Nagel as a family burial ground or as a semi-public one, those having the right of burial therein obtained an easement or a license having all the qualities of an easement. (*Buffalo City Cemetery* v. *City of Buffalo*, 46 N. Y. 503; Perley Mortuary Law, p. 178.) This right created by acceptance of the dedication was subject to loss if abandoned and if the plot dedicated was not maintained as a burial place. (*Hutchinson Land Co.* v. *Whitehead Bros. Co.*, 218 App. Div. 682; Perley Mortuary Law, p. 181.) The fee of the land remained in Nagel and his heirs. (*Hunter* v. *Trustees of Sandy Hill*, 6 Hill, 407.)

I find that the plot was maintained as a cemetery in a fairly decent state of preservation and repair until about the beginning of the present century. From then on it was permitted to run into a condition of disrepair and neglect. In 1908 the street now known as West Two Hundred and Twelfth street was physically opened. The grade of the cemetery was higher than that of the street, and as a result when the street was cut through a jagged bank of earth, unfenced, marked the south side of the cemetery. There was never any fence or other barrier on that side thereafter. The condition of deterioration continued progressively. The last record of a burial therein was in 1908, and the burial next preceding that was in 1902. In the years after 1908 and prior to 1926, owing to the advent of the subway, the neighborhood became partly built up. Its growth was vicarious. Along one side of the cemetery plot tenement houses were erected and no separating fence appears to have been maintained. Clotheslines running from windows in the tenements were fastened to trees in the cemetery. In 1926 the cemetery had fallen into complete dilapidation. It was overrun with weeds in most places with no walks or pathways therein excepting where the passersby had worn one

winding path across a part of the cemetery in constantly crossing it. The ground showed scars where sod had been removed willy-nilly. Litter covered the plot and only the vestige of a few broken headstones were visible. One witness stated that many of the stones were carried away for baseball marks by the boys and another told that here and there human bones showed through the surface. Some of the foregoing conclusions I have drawn from photographs; others from the testimony.

I, therefore, find that in 1926 the plot involved, while still holding the bones of more than 400 dead, had been for all practical purposes abandoned as a burial ground, as that term is ordinarily understood. I am of the opinion that had application been made by Nagel's heirs, the court would have relinquished its trust and permitted the reinterment of the dead in a cemetery that was properly maintained. While no specific statute has been called to my attention authorizing the courts to declare a private cemetery abandoned, as to cemetery corporations express power to so order is given to the Supreme Court. (Memb. Corp. Law, § 71.) On the other hand, there is no law which prohibits the removal of human bones from a cemetery for lawful purposes and placing them elsewhere. (*Matter of Board of Street Opening*, 133 N. Y. 329.) Mere disuse as to new interments or failure to cut the grass or care for the headstones does not constitute abandonment of a cemetery. (*Clarke* v. *Keating*, 183 App. Div. 212.) If follows, however, by removal of the bodies therein such use will be deemed to have ceased. The courts are prone to protect the sacredness of the final resting place of the buried dead as long as the circumstances warrant. But we have not here the sole question as to what a court might do with respect to declaring abandoned the right of burial in this plot. We have a case where by eminent domain the city has found it necessary to physically remove the cemetery. Under such circumstances the relatives of the persons buried or the city could cause reinterment. (*Matter of Board of Street Opening*, 62 Hun, 499.)

The inquiry remains, Is any one to be paid for the cemetery plot and if so whom and how much? The test is what was the market value of the land at the time of the taking in view of the use to which it had been dedicated. If at the time of condemnation it was practical for the owners of the fee to assert their right to the land unincumbered by any burial easement, they are entitled to substantial damages. Among other means of procuring the unincumbered fee it appears to me the Nagel heirs might, under the circumstances, have proceeded by an action in partition. (*Clarke* v. *Keating, supra.*) The interesting opinion of Thomas

Baskerville, Esq., filed April 22, 1909, in the action of *Camman* v. *Camman* (Supreme Court, New York county), affecting the old cemetery formerly at Sedgwick avenue and Fordham road, borough of The Bronx, New York city, shows how such result was effected in that form of action. It appears to me that in 1926 future burial easements had been for all intent abandoned by those entitled thereto and that the heirs in whom the fee was vested were entitled to the removal of the cemetery on condition of reinterment of the dead buried therein and that the land had a substantial value to them at the time of condemnation. They are entitled to the value of the unincumbered fee as damages less what it would have cost them to remove the cemetery. I see no reason why the sum expended by the city would not fairly admeasure that deduction. The contractor who removed the dead for the city was paid $40,088.58. While some of this amount was paid for excavation which might not be necessary solely for disinterment, I feel that the method that the city followed entailed a cost approximately the same as others attempting the removal of bodies would have incurred. As there was but little difference between the greatest depth excavated and the greatest depth at which bodies were found, it probably was as cheap to remove the whole soil above the street grade. In any event, as the cost of excavation would be deducted from the value of ungraded lots, if the plot did not contain a cemetery, there can be no substantial difference entailed.

I, therefore, find that the present owners of the fee of the cemetery plot are entitled to a sum to be ascertained by applying the unit prices fixed by me for lots, on grade, facing the respective streets, less the sum of $40,088.58. I will increase this deduction by $3,000 if the city has expended or agrees that it will expend that amount for a shaft to designate the new graves in Woodlawn. I hereby award such sum to unknown owners. Proof may be taken by the corporation counsel as to those entitled thereto. Let a decree be entered accordingly.