BOARD OF HUDSON RIVER REGULATING DISTRICT, Plaintiff, *v.*
JOHN A. WILLARD REALTY & LUMBER CO., INC., Defendant.

Supreme Court, Fulton County, July 12, 1932.

*Roscoe Irwin*, for the plaintiff.

*T. Cuthell Calderwood*, for the defendant.

ROGERS, J. The property consists of approximately twenty-seven and one-half acres of unimproved land situate at the outskirts of the village of Northville, Fulton county. The commissioners have awarded $32,800 for the lands and for consequential or severance damages. The court may not deny confirmation because the award is liberal or even excessive, unless it is obviously and clearly wrong and is such as to shock the sense of justice of the court or unless the commission has adopted an erroneous rule or theory in determining damages. (*Matter of City of Rochester*, 234 App. Div. 583.)

The commission allowed $17,800 as the fee value of the lands taken. This allowance was based on the theory that sixteen and one-half acres of the lands in question were available for building sites, and that nine and one-half acres were vacant farm or pasture

lands. The allowance was $800 for the nine and one-half acres of farm land, and $17,000 for the sixteen and one-half acres considered as building lots. The subdivision map shows ninety-three lots, a few of which were subject to flooding. The commission evidently allowed an average value of about $200 for each of the remaining lots.

The commission in its supplemental report stated: " It took into consideration that the defendant had mapped a portion of the premises into lots and considered the possibility of its development in accordance with said map. It considered the adaptability of the property for building purposes in regard to its elevation above the normal flow of the Sacandaga River, and found that with the exception of a small portion at the south end of said property, the said property was adapted to use as building sites for dwellings."

The commission also stated in its supplemental report: " The item of $17,800 is not based upon acreage or lot value, but is our best judgment as to the value of the property taken as a single parcel, considering, however, all of the elements which we have heretofore mentioned."

From these statements it is apparent that the commission had in mind the very matter that has troubled the court in confirming the award, namely, that while the plot lent itself to division into building lots, was high enough above the river to be suitable for that purpose, there was no demand, either present or in the near future, for any considerable number of these building lots. Therefore, they had no market value as individual building sites; that the only market for the plot was as a single parcel. Yet the commission in determining its value as a single parcel considered the elements that it had been mapped into lots and was adapted for building purposes.

It makes no very great difference in the value of property that it may readily be cut up into lots and that the lots will be suitable for the location of dwellings, provided that no one wants to buy the lots for such purpose. Most any farm meadow could be cut up into lots and the lots would be level spots upon which to erect buildings. There must be a demand for such lots, if not immediate then in the reasonably near future, so that the purchaser could consider the enhancement in value as time passed as an offset to the carrying charges. " The possibility of its development in accordance with said map " is not enough. There must be reasonable probability and not merely possibility of development.

The village of Northville has a population of 1,250. From 1915 to 1930 the population increased 203; from 1925 to 1930, 126; during the period from 1920 to 1930 only 60. The condemned

lands are apart from the business and residential sections, in which there are available a sufficient number of vacant lots to take care of the normal growth of the village for many years.

In *Matter of Bronx Parkway Commission* (191 App. Div. 212, at p. 217) the court stated: " The estimation of the fitness of such vacant land for building improvement, or for a commercial use, must be made real by a market value so used, to be reasonably expected in the near future, not speculative schemes of someone who proposes a new and previously untried venture."

In *Matter of Simmons* (130 App. Div. 350, 352, 353) SEWELL, J., writing for the Third Department, said: " The owner is not entitled to swell the damages beyond the fair market value of the land at the time it is taken by any consideration of the chances or probability that sometime in the future it may be used for some purpose to which it is adapted unless it appears that the market value of the property is enhanced by the chances or probability."

" The mere fact that this property was mapped out into lots and so-called streets laid down upon the map, and nowhere else, did not require the commissioners to consider this property as lots." (*Matter of Department of Public Parks*, 53 Hun, 280, 300; *Matter of N. Y., L. & W. R. Co.* v. *Arnot*, 27 Hun, 151.)

" Nearly any tract of land or any farm can be cut up into lots or villa sites. The question is not whether it can be so subdivided, but whether purchasers for the lots can be found, and also how speedily found. For if only small parts can be sold at intervals and a number of years must elapse before the whole property can be disposed of, it is apparent that it would be unfair to take as the present value of the property a sum only to be realized after a long lapse of time." (*Matter of Daly* v. *Smith*, 18 App. Div. 194, 197, 198.)

That there is no present market value for village lots from this tract is emphasized by the testimony of the defendant's witness Forbes in the following testimony: " Q. Still you say that the property had a value as of a particular time of $22,250? A. That is based on the potential value of the lots, what they would sell for singly. Q. If you waited long enough then and were lucky enough you would sometime sell the whole thing? A. Yes, sir. Q. And for that reason you say that the land in 1927 had a value of $22,250? A. Yes, sir. Q. If you were to take into consideration the carrying charges on $22,250, is it what you would call a good investment? A. I could not say."

It may be that a few of the lots nearest the center of the village could be sold as building sites to purchasers having an optimistic view as to the future growth of Northville. It may be that some

such purchaser might erect a dwelling house on his lot and thereby get the development started. Even assuming this possibility, only a few of the most desirable of the lots would be in demand for years to come. The commission has not made its award on the basis that a few of the lots would come into the market within a reasonable length of time, but in effect has awarded an average present value of $200 upon each of the eighty-five lots, amounting to $17,000. The interest on this sum alone, $1,020 a year, would consume the avails of the sale of five lots each year. Taxes, the laying out of streets, making water, electricity and telephone available and selling costs are some of the additional expenses to be considered in determining the present market value of the whole plot. The commissioners have visualized the situation as if all of the lots had a present or near future market value, whereas at most there would be a demand for only a very few of them. Such vision goes too far afield and chimerically wanders away from the practical aspects into the realm of speculation. The commissioners chose between the plaintiff's experts, who placed the value of the tract at $1,250, and the defendant's experts, who gave the value as $22,500. They shaved off $50 a lot from the valuation given by defendant's experts, but overlooked the important aspect that there existed no demand or market value at all for the great majority of the lots into which the tract had been platted.

The present commissioners having found and expressed their opinion of value based on a theory deemed by the court erroneous, should not be compelled to decide against their honest belief; therefore, a new commission should be appointed before which the parties may develop proof as to the number of lots, if any, that have market value as such and the amount thereof. Having determined this number, the balance of the lands should be appraised as farm lands.

The commission awarded $15,000 as the value of the so-called 160 by 400 foot lot included within the tract appropriated because of its special use as a place for dumping sawdust that came from the mill operated on the Hugh Willard lot. The Hugh Willard lot is contiguous to the appropriated tract and is at a higher elevation than the so-called 160 by 400 foot lot. Sawdust and shavings were blown from the sawmill down the slope toward the river upon the Hugh Willard lot and a portion of the 160 by 400 foot lot was used as a depository for this refuse. To burn, or cart away, or otherwise dispose of the sawdust would be a much more expensive operation than simply to blow it through pipes down the slope onto the land below.

The defendant was incorporated November 10, 1925. John A.

Willard was elected president and treasurer of the company. John A. Willard conveyed the so-called Hugh Willard lot to his son Hugh Willard by deed dated September 9, 1925. Thereafter the sawmill was erected thereon and operations began in 1926. Whether the sawmill business was owned by Hugh Willard or by the defendant was a mooted question at the hearings. Plaintiff contends that the evidence establishes that John A. Willard set his son Hugh Willard up in the sawmill business, and while he helped to finance the business it actually belonged to and was being operated by Hugh Willard at the time of the appropriation. Defendant contends the proofs establish that the business belonged to the defendant; that Hugh Willard acted as the defendant's agent. After the appropriation, on May 9, 1931, Hugh Willard conveyed the sawmill lot to the defendant. The agreement executed by the defendant giving the plaintiff possession of the appropriated tract was made September 5, 1929. So at the time the defendant acquired title to the lot on which the sawmill operations were conducted the plaintiff has appropriated the parcel where the sawdust was dumped and was in lawful possession of it.

To whom the sawmill business belonged is not important. Inasmuch as the 160 by 400 foot lot was being used for a sawdust dump at the time of the appropriation the question is what was its value for that purpose? The real question is what amount has the owner lost? To determine what has been lost the highest utility should be considered. This lot was worth most used as a sawdust dump and should be valued on that basis. ( *New York Cent., etc., R. R. Co.* v. *Mills,* 160 App. Div. 6; *New York Tel. Co.* v. *De Noyelles Brick Co.,* 154 id. 845; affd., 209 N. Y. 526; *Matter of Board of Transportation of City of N. Y.,* 140 Misc. 557, 559.)

The investment in the sawmill buildings and equipment was $12,500. The testimony is that to cart away or to dispose of the sawdust otherwise than by blowing it on this lot would cost $1,200 per year and that the company had a supply of logs that would assure the continuance of operation for twenty years.

The plaintiff offered no proof of the value of the lot as a sawdust dump. It took the position that because the owner of the lot was not the owner of the mill there could be no severance or consequential damages and that, therefore, defendant could not recover for the value of the special use to which the lot was devoted. If Hugh Willard owned the business the defendant could demand rent. If the defendant owned the business it received the value of the use of the lot by saving the cost of otherwise disposing of the sawdust. Whether a small sawmill business could afford an expense of $1,200 per year for a sawdust dump and operate profitably; whether the

cost of otherwise disposing of the sawdust is as much as claimed by the defendant will be questions for the new commission to decide. On the proof as it now stands this court cannot hold that $15,000 is excessive value for the lot used for such special purpose.

The defendant claims that the monuments erected by the plaintiff are beyond the taking line. The commissioners viewed the premises and evidently included as part of the appropriated tract all lands between the monuments and the river. The plaintiff should receive good title to the lands it pays for and, therefore, the new commissioners should be furnished proof as to the location on the ground of the appropriation line. If any lands are taken beyond the 778 foot elevation line a separate finding as to their value should be made so that if the court decides that no lands beyond the 778 foot elevation line may be condemned the matter can be taken care of without further proceeding before the commissioners.

The reports and award of the commissioners should be set aside for error of law and because the award is excessive and a rehearing should be had before new commissioners.