3 N.Y.2d 37 (1957)
St. Agnes Cemetery, Respondent,
v.
State of New York, Appellant.
Court of Appeals of the State of New York.
Argued January 11, 1957.
Decided May 23, 1957.
Jacob K. Javits, Attorney-General (Sidney Kelly, Jr., and James O. Moore, Jr., of counsel), for appellant.
Joseph J. Casey for respondent.
CONWAY, Ch. J., DESMOND and FROESSEL, JJ., concur with BURKE, J.; VAN VOORHIS, J., dissents in an opinion in which DYE and FULD, JJ., concur.
*39 BURKE, J.
This appeal involves an award made by the Court of Claims for a portion of claimant's cemetery land, appropriated by the State Highway Commission for highway purposes. This cemetery is located two miles north of the city of Albany and has been in existence for almost a century, during which time there have been over 50,000 interments. Prior to this appropriation which occurred in 1952, the cemetery contained about 150 contiguous acres of land. The condemned strip traverses and bisects a parcel of almost 14 acres of land located at the southern extremity of the cemetery. This particular parcel was acquired by the cemetery in 1938 not only to meet the growing demand for cemetery plots, but because it fronted on a public highway to the south, from which an exclusive, safe and convenient means of access could be had. Prior to this acquisition, the only means of ingress and egress to and from this cemetery was over a roadway easement through another cemetery which intersected a railroad track at grade level, a way which was inconvenient for the people of Albany due to a general westward shift in the population of that city. By 1951 this parcel, as well as the adjoining cemetery property, was improved by arranging it as a modern garden-type cemetery  that is, in place of the headstones which are found in a monument cemetery, there are bronze markers set in concrete at ground level which gave the area a park-like appearance. As part of this improvement, plans were drawn for the construction of a memorial entrance abutting the highway to the south with a central drive extending from the entrance to a memorial statue in the interior portion of the cemetery which provided a suitable theme for the new entrance. From the highway on the south there would be an unobstructed view of the new entrance, the central drive with a series of separate gardens on each side and the memorial statue. The improvement by the State raised an embanked four-lane highway over the condemned strip which destroyed not only the access through this new entrance on the south, the cemetery lots in the area taken by condemnation, but also depreciated the value of the cemetery lots north of the new highway and the lots south of it in the separated portion of this parcel.
*40 As the Appellate Division has affirmed the judgment of the Court of Claims "in all things", the facts are not open to our review. Likewise, as the finding of value is supported by substantial evidence, it also is "immune from further review" (Matter of City of New York [Sound View Houses], 307 N.Y. 687, 688).
Thus, the sole issue presented by this appeal is whether the finding of value is the product of the application of an erroneous principle of law (Matter of City of New York [Exterior St.], 285 N.Y. 455, 458).
The State charges the courts below with the adoption of an illegal measure of damages in determining the value of a cemetery property. The criticism is not that there is a lack of testimony in the record supporting the valuation but rather that an improper theory of appraisement was used. It is the State's position that the damages are to be measured by the value of the cost of replacement of the land. The loss to this particular cemetery, at maximum, it says, is the cost of replacement.
The trial court, the State contends, capitalized net profits to arrive at the value of the property. Such a statement is best tested by an examination of the method of valuation or appraisal resorted to by the court. The Court of Claims, following the general rule, found the reasonable market value of the affected area of the cemetery before appropriation and after appropriation (Matter of Prospect Park & Coney Is. R. R. Co., 13 Hun 345, 347). In determing the value before and after appropriation, the court referred to the sales prices which the cemetery had obtained for the sale of burial lots located in the adjoining garden sections. The value of the burial lots in the affected area of the cemetery was determined by applying the unit value based on the average sales price per lot, less sales costs, of the lots sold in the adjoining garden sections to the number of lots affected. Thus, the court, after so averaging the total number of affected lots  having used the unchallenged sales prices of $400 each for immediate need lots and $300 each for pre-need lots and having deducted the sales costs  found the value to be $147.50 per lot. It determined the present value by further discounting from the total value of the affected lots ($147.50, the value of each affected lot, multiplied by the total number of such lots) the amount of 2% per annum on the amounts receivable each year in equal installments over a period of *41 40 years, which it determined to be the economic life of the cemetery as a whole.
In arriving at the value of the appropriated cemetery property, the trial court considered the methods used by the State's witnesses and the methods adopted by the witnesses called by the claimant. The court states the value at a different figure from that given by the experts. This is a finding of fact which we cannot disturb unless a rule of law was violated.
Speaking generally of methods of valuation, this court stated in Matter of City of New York (Fourth Ave.) (255 N.Y. 25, 30): "The experts, as well as the judge, may have many different methods in arriving at the same point or at the value of the whole. These considerations are mere matters of evidence to prove facts. As long as competent evidence is received, and none excluded, no rule of law is violated, if the main purpose is served of ascertaining the value of the whole".
The legal questions raised here, although simple in theory, at times have proven difficult of practical application to the circumstances in which they arise.
It is axiomatic that in appraising land the fundamental question to be answered is "what has the owner lost, not what has the taker gained" (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195 [1910]), and that an owner whose property is acquired by condemnation is not limited in compensation to the use which he made of his property but is entitled to receive its market value "based on the most advantageous use" (United States v. Miller, 317 U. S. 369, 375; Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, 82, affd. 279 N.Y. 656; Olson v. United States, 292 U. S. 246).
This, of course, does not mean that if the property by reason of its particular use is worth more for that particular use than any other, its market value will not be so measured. Where property has a higher value because of a restricted use than what might otherwise be the value of the highest and best use of property so situated, the value resulting from the restrictive use is, of course, the highest and best use of that property (Sanitary Dist. of Chicago v. Pittsburgh, Fort Wayne & Chicago Ry. Co., 216 Ill. 575; Pittsburgh & Western R. R. Co. v. Patterson, 107 Pa. 461; Matter of Port of New York Auth. [Lincoln Tunnel], 2 N Y 2d 296; Mattydale Shopping Center v. State of New York, 303 N.Y. 974).
*42 In United States v. 1 Acre of Land More or Less in Pulaski County, Virginia (W. D., Va., decided June, 1945, unreported, D. J. File No. 33-48, 228-4), where the United States condemned a private cemetery, the court valued the land for cemetery purposes. The court said: "Even if we consider that, because private cemeteries are not commonly bought and sold, this property has no market value, or that its market value is impossible of ascertainment it does not follow that the compensation for it must be based on its adaptability for an entirely different use. . . . But the fact that there might be many more potential purchasers of the land for farm purposes and that a sale for such purposes is more readily negotiated does not require that it be valued on that basis. The law does not limit market value to that based on the use for which land may be most readily and easily sold. Common knowledge might suggest that a purchaser desiring to continue the use of this property for a private cemetery would probably not be easily found but it is not impossible that there is such a market, nor it is impossible in view of the improvements on the lot, that a purchaser might be willing to pay for it a sum greatly in excess of that which it might bring if acquired for other purposes."
Recognition of the unique value of cemetery property may be found in Fidelity Union Trust Co. v. Union Cemetery Assn. (104 N. J. Eq. 326) where the court said "land, when dedicated to the burial of the dead, acquires an unique value by the grace of its consecration and the exclusiveness of the cemetery franchise." (See, also, East Ridgelawn Cemetery v. Winne, 11 N. J. 459.)
In the cases dealing with restricted uses which allow the land to be valued on the basis of surrounding lands, either no evidence was introduced valuing the land for purposes to which the property had been devoted, or such use had been abandoned or the property had not been developed and improved for the restricted use. (Westchester County Park Comm. v. United States, 143 F.2d 688 [C. C. A. 2d, 1944], cert. denied 323 U. S. 726 [1944] [park]; Laureldale Cemetery Co. v. Reading Co. 303 Pa. 315 [cemetery]; Matter of Board of Transp. of City of New York, 140 Misc. 557 [abandoned cemetery]; George Washington Mem. Park Cemetery Assn. v. Memorial Development Co., 141 N. J. Eq. 47, 54 [new cemetery].)
*43 The George Washington case (supra) involved a fraudulent scheme of a development company to overcharge a memorial park association for land unimproved for the restricted use. The court (p. 58) described the property as "virtually a wilderness".
In the Westchester County case (supra, p. 692), the court stated: "It may be that, if the County had proved the worth in money terms of the use as a park site, it would be entitled to compensation therefor. But we need not here consider that question since, although the County was at liberty to do so, it presented no evidence on that issue."
In the Laureldale case (supra), the railroad company appropriated 8¼ acres of undeveloped land in a remote part of Laureldale's 117-acre tract. Therefore the court ruled that since the portion of the new cemetery taken was merely adaptable for cemetery purposes, it was not to be valued as cemetery property.
The Laureldale Cemetery bears no resemblance to the claimant property. The Laureldale Cemetery was three years old. Only a minute part of the 117-acre tract had been developed. Claimant cemetery has been active for 85 years, and has had a steady growth and development. At Laureldale Cemetery only 417 interments had been made. At claimant cemetery, over 50,000 interments had taken place. As the court in Laureldale said (p. 323), the land taken was a "current liability rather than an asset". Here claimant had acquired the additional land 14 years before the appropriation, as necessary for its continued and proper operation and essential to its needs in serving the demands of a growing clientele. All the land held by claimant consisted of a single unit of land, whereas the Laureldale property consisted of three tracts of land separated by highways and a railroad and the condemnation was, in fact, for the purposes of the already existing railroad.
In Cementerio Buxeda v. People of Puerto Rico (196 F.2d 177, cert. denied 344 U. S. 876), the court rejected the doctrine applied in the case of Laureldale Cemetery Co. v. Reading Co. (supra) as erroneous and in any event not controlling where cemetery property of a well-established cemetery has been appropriated. In a 1953 proceeding, the real estate expert for the Highway Department of Pennsylvania, after due consideration, reached the same conclusion. In 1952 the Highway Department *44 of Pennsylvania condemned 12.327 acres of the cemetery property of Easton (Pa.) Cemetery and severed an additional 11.172 acres. Some of the property was wooded and undeveloped. Some areas were unsuitable for interments. Considering the Laureldale case inapplicable, the expert for the Highway Department of Pennsylvania and the expert for the cemetery appraised the property as cemetery property, a value which reflected its highest and best use. (Finkel, Condemnation Appraisal of a Cemetery, Appraisal Journal, July, 1955, American Institute of Appraisers, pp. 379-386.)
Hence the weight of authority supports the rule that if the land taken is an integral though unused portion of a well-established cemetery, that is, a portion of a cemetery in which there have been no interments and no sales of graves, the property should be appraised on the basis of its value for cemetery purposes. The fact that there were no burials in the condemned or consequentially damaged parcels is proof of damage to the cemetery (Cementerio Buxeda v. People of Puerto Rico (196 F.2d 177, cert. denied 344 U. S. 876, supra). The quantum of damage depends on the value of the plots. The unit of appraisal may be the value per square foot of the burial plot or the value of the burial plot as a whole (Finkel, Condemnation Appraisal of a Cemetery, supra; Cementerio Buxeda v. People of Puerto Rico, supra; Elmhurst Cemetery Co. v. Commissioner of Internal Revenue, 300 U. S. 37, 39). The law is well settled that market value can only be established by sales of other property in the vicinity which is similar to the property taken (Court of Claims Act, § 16; Village of Lawrence v. Greenwood, 300 N.Y. 231).
In valuing cemetery property, evidence of the value of the burial lots founded on the net sales prices of similar burial plots shows the productiveness and capabilities of the land taken for yielding income as bearing on value  the present value  of the land itself.
In Elmhurst Cemetery Co. v. Commissioner of Internal Revenue (300 U. S. 37, 39, supra), the United States Supreme Court said in passing upon the valuation of cemetery property "`We are of the opinion that the valuation for which the petitioner contends is reasonable and should be allowed. It is based upon actual sales [of burial plots], and consequently comes as closely as may be to that fair market value, so often judicially defined *45 as the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell.'"
There is ample authority that testimony as to future income has been accepted as evidence which has probative value. We recently approved an award made at Special Term, based on the rental of land used for a gasoline service station. The stated rent was allowed as a predicate for the appraisal of the value of the land rented, not only for the period of the lease term of 15 years, but for the additional period of a 5-year renewal option at the same net rental (Matter of Port of New York Auth. [Lincoln Tunnel], 2 N Y 2d 296, supra). The use, i.e., gasoline service station, was a temporary licensed use, subject to revocation.
In Mattydale Shopping Center v. State of New York (303 N.Y. 974, supra), an award of the Court of Claims was reinstated which was based on evidence that the claimant intended to build a shopping center. Claimant's testimony showed the execution of four leases for space therein and established, by expert testimony, the rental value of the unrented proposed stores in the not-as-yet-constructed shopping center.
Superficially it would appear in these cases that the trial court reached a value derived from capitalization of profits, a theory of appraisal which has been condemned (United States ex rel. T. V. A. v. Powelson, 319 U. S. 266) but actually this court, conscious that business profits are not allowable, adopted the rule that present value of "clearly to-be-expected future earnings may be considered" (Brooklyn Eastern Dist. Term. v. City of New York, 139 F.2d 1007, 1013 [C. A. 2d], Ann. 152 A. L. R. 296, 307, cert. denied 322 U. S. 747). The method of valuing real property on the basis of earnings past as well as prospective was considered appropriate in those cases. The Court of Claims has utilized that method as supported by actual sales. In this case the theory of damage and method of appraisal are based upon a proof of loss of the value of the land itself, not a capitalization of profits. The circumstances of an established cemetery are less subject to change than business enterprises, and offer a safe guide to value. Certainly the future prospects of this cemetery are not as speculative as a planned shopping center or a gasoline station. Because of the inevitability of death, the demonstrated experience of the cemetery, the *46 increase in population of the capital district, the future of this cemetery is not subject to variable business factors or dependent upon the exercise of business judgment attending the operation of a gasoline station or planned shopping center or a freight terminal. The method used by the court is not a capitalization of hope of expected profits. The actual sales of nearby burial plots were before the court with the prices received and the expenses incurred in connection with the sales.
The Judge of the Court of Claims used the average net unit price obtained in the adjoining garden areas as to the base sale price of the total saleable area affected by the condemnation. He disregarded any increment which would be the profit on the land. The formula applied by the court was: the net average selling price less discount for the deferred realization over the selling period. In this manner the court eliminated any consideration of profit as the discounted sum represents the present worth of the cemetery land less any profit. Evidence of the value of the burial plots, therefore, was not used by the court to allow a loss in business profit but to determine the value of the cemetery land. The compensation awarded was the equivalent in money of the property taken and consequentially damaged.
The principle of substitution, i.e., replacement cost, is not germane. Where the taking splits apart property which is held in one parcel and used for a single purpose by the building of a heavily traveled highway through the property leaving a truncated section, restoration of the use of the property as a unified and combined whole is manifestly impossible. The land taken is irreplaceable by the substitution of other land in a different location. Replacement cost has not been admitted as evidence in measuring the value of vacant land. The same rule applies to condemnor as condemnee. (Matter of New York, Lackawanna & Western Ry. Co., 49 Hun 539; Louisiana Highway Comm. v. Boudreaux, 19 La. App. 98; Jeffery v. Chicago & Milwaukee Elec. R. R. Co., 138 Wis. 1; City of Chicago v. Cunnea, 329 Ill. 288; 2 Lewis on Eminent Domain [3d ed.], pp. 1145, 1146, 1147; 2 Orgel on Valuation under Eminent Domain [2d ed., 1953], § 189.) Evidence of replacement or reproduction cost has been accepted in cases only of structures designed for special purposes, such as the stock exchange, but not as to vacant land.
*47 Mitchell v. United States (267 U. S. 341), Banner Milling Co. v. State of New York (240 N.Y. 533), and Matter of City of Rochester (234 App. Div. 583) involve claims for loss of business and hence have no application. Cemeteries collect substantial income from interment fees, rental of tents and other burial appurtenances, sales of markers and other miscellaneous services. This income, together with income from the increment in value of the burial plots condemned or consequentially damaged would represent future business profits described as damages in those cases. Such evidence does not appear in the record and was not an element of damages allowed. Similarly, cases wherein the evidence was conjectural and speculative are inapposite, such as New York Central R. R. Co. v. Maloney (234 N.Y. 208 and Sparkill Realty Corp. v. State of New York (268 N.Y. 192).
The trial court properly excluded testimony concerning the asking price of nearby property. (4 Nichols on Eminent Domain, § 12.3113, subd. [3]; 2 Lewis on Eminent Domain [3d ed.], pp. 1145-1146, 1147; 1 Bonbright on Valuation of Property, p. 168; Matter of New York, Lackawanna & Western Ry. Co., 49 Hun 539, supra; 2 Orgel on Valuation under Eminent Domain [2d ed., 1953], § 189, p. 5.)
Finally, the determination of the rate of discount is a factual question and not subject to review.
We find no error of law in the ruling of the Court of Claims, and, therefore, the judgment should be affirmed, with costs.
VAN VOORHIS, J. (dissenting).
The State complains of the method of assessing compensation for the condemnation for highway purposes of 3.221 acres of land out of a tract of 13.939 acres. A fraction of an acre of this 13.939 acres was acquired by claimant St. Agnes Cemetery in 1931 and the rest in 1938 at a total cost of $22,500. For the 3.221 acres and damages to the remainder of the 13.939-acre tract, the Court of Claims awarded $209,000, plus interest from the date of appropriation on November 20, 1952, amounting in all to $230,712.78. It is conceded by respondent that no consequential damage has resulted to any other portion of the cemetery.
Although the cemetery, containing about 150 acres, has been in existence for almost a century, no part of this tract of 13.939 acres has ever been developed; no burials have been made in it, and not a single plot has been sold in this area. All that *48 existed on the date of appropriation, insofar as this portion of the cemetery was concerned, was a plan by a sales organization, proposing to lay out the area into plots and to build a road through it to connect with the developed portion of the cemetery. As far as the physical condition of the land is concerned, it was vacant, unimproved land, apparently in the same condition in which it was when it was purchased. The cemetery was engaged in developing shrines north of the area affected by the condemnation. To this end it had entered into an agreement with a sales organization to develop the shrines and to put on a sales campaign to induce customers to buy lots before they were actually needed. These pre-need lots were sold at the rate of $300 per lot, payable in installments over a period of 2½ years with a 5% discount for payment in 90 days. These lots were distinguished from the immediate need lots which were sold at the rate of $400 a lot, with one-third down and the balance payable in 90 days. From the sales prices of the pre-need lots, the claimant's witnesses made deductions of 75% (including 25% for development, 20% for perpetual care, and 30% for planning and selling expenses) to arrive at a net profit to the cemetery of $75 for each pre-need lot. From the prices for the immediate need lots, the claimant's witnesses made deductions of 45% (including 20% for perpetual care and 25% for development) leaving a net of $220. They concluded that the cemetery would have an average profit of $147.50 per lot. They then assumed that a similar development could be made of the area affected by the condemnation, with sales at the same prices and profits at the same rate. They estimated that the total number of lots that could be sold out of the 13.939-acre tract, as so developed, would be 2,912 lots. They multiplied this number by the average profit per lot and decided that this was the amount that the cemetery would realize when all the lots in the tract were sold  3,720 unsold lots remained in the developed portion.
The Court of Claims multiplied the average prospective profit per lot (as assumed by the claimant's witnesses) by the number of lots which those witnesses said would be sold every year. The court computed the award as the present value of the sum of this series of predicted annual payments, discounting these predicted annual payments on a 2% basis. In other words, the court accepted the claimant's forecasts and its calculations *49 as to net profit, and assumed that a purchaser would pay for the property, as of the date of taking, a cash sum which at 2% over a period of 40 years would exactly equal the amount of the profit that the claimant says it could derive from the sale of burial lots plus consequential damages to the rest of the 13.939-acre tract.
The State's witnesses estimated the market value of the tract at $42,000, the value of the remainder after the taking at $16,000, leaving a difference or damage of $429,500. The witnesses on the other side valued the 13.939 acres at $429,500 and the damage at $327,000. These enormous discrepancies call for careful examination. The State contends that the claimant's witnesses used an erroneous method in that they simply capitalized prospective profits and that, in adopting this method, the courts below committed error.
The trial court justified this method of valuation by reference to the standard of "what a willing buyer would pay in cash to a willing seller." It is quite clear, however, that far from being what a willing buyer would pay in cash to a willing seller, the award is rather the maximum amount which under any circumstances and by the widest stretch of the imagination could be derived from the projected sale of burial lots out of this 13.939 acres. It seems most unlikely that a purchaser could be induced to pay such maximum amount. He might prefer to keep his cash in a savings bank or invest it in United States government bonds with greater security and at a higher rate of return than the 2% assumed by the trial court. And he would prefer to follow this course because the maximum amount arrived at by the process adopted by the trial court would involve so many uncertainties that he would want to reduce this maximum amount very considerably to allow for the possibility that many of the court's assumptions as to the number and rate of sales, the difficulties of collection, the expenses involved in maintaining the cemetery, and other relevant factors would not be borne out by the actual facts over the 40-year period assumed by the court.
The court's determination of this maximum amount involves so many conjectural and speculative amounts that in our view the award should be reversed. In the first place, the trial court took it for granted that once land has been included in a cemetery, or falls into the possession of a cemetery, it becomes *50 immediately available for sale as individual burial lots. If this taking had occurred the day after the cemetery purchased the property, an allowance on the basis adopted by the trial court would have been plainly excessive; and is excessive now in the light of the fact that this land has lain undeveloped for 14 years during which time not a single plot has been sold out of the area. There is nothing in the testimony to indicate that there was an active demand for plots out of this area on the date of appropriation, or that the cemetery was ready to meet this demand on that date. The uncertainty of the sale of lots even out of the developed areas is indicated by the high rate of commissions  30%  which the cemetery agreed to pay to the selling organization. While the trial court decided it would take 40 years to sell the lots out of this area, there was no finding as to the date when sales from this area would begin. If these lots were not available for sale for a number of years, the trial court's calculations would be wide of the mark.
Another speculative element was the period during which it was assumed that these retail sales would be made. Claimant's witnesses fixed a period of 40 years which they then cut in half and then again in half, making their computations as though the retail sales prices of all the individual lots would be collected in a lump sum at the end of 10 years. The State's witnesses estimated that the period over which lots would be sold might be 30 years and the trial court decided that 40 years was the appropriate time. By their nature these were nothing but conjectures, and they can hardly be the basis for an award to be paid to an owner for taking private property for public use. Fluctuations in sales prices over a period of 40 years, as well as changes in the value of the dollar, do not diminish the speculative uncertainties.
Most conjectural of all, perhaps, were the deductions that were made from the assumed gross sales prices of the individual lots. In addition to the deduction of sales commissions of 30% for the pre-need lots, the court took into consideration a deduction of 25% for development of the area and of 20% for the perpetual care of the lots. The deductions thus amounted to 75% for the pre-need lots and 45% for the immediate need lots. However, no deductions were made for administration expenses nor even for the permanent and current maintenance of the cemetery. According to one of the State's witnesses, these *51 deductions would have amounted to 95% of the retail sales price of the individual lots.
Even if we were to disregard all of the speculative and conjectural elements in these calculations, and were to agree that the finding accurately indicated the amount that might be derived from the sale of lots out of the area affected by the condemnation projected over a period of 40 years, this amount could not be regarded as fixing what "a willing buyer would pay in cash to a willing seller" at the appropriation date. It is not synonymous with market value. The market value depends upon what a purchaser would pay for the 2,912 lots in this undeveloped portion of the cemetery at the appropriation date, not upon how much it is imagined could be realized from their individual sales during the unknown future. The existing market for these lots is necessarily affected by the circumstance that 3,720 additional lots remained unsold in the original, developed part of the cemetery. In other words, assuming the affected 13.939 acres to have been subdivided and developed  which it has not been  there would have been 6,632 unsold lots in the cemetery at the time of taking. Each lot contained four burial spaces, which signifies 26,528 vacancies in the cemetery. It is inconceivable that another cemetery purchasing this property would have paid such a sum as has been awarded for these undeveloped lots. The price which would be paid by such a purchaser would not have corresponded with what St. Agnes Cemetery might realize from individual sales during a possible 40 years, but would have been determined by what such a purchaser would have had to pay for other comparable property. It is said that the highest and best use of this land is as cemetery property, but this property has no uniqueness of its own which makes it available for cemetery use. What makes it cemetery property is not its location or its physical characteristics but the nature of its ownership. This property could be sold for cemetery purposes only to a purchaser equipped with the legal powers, authorizations and permits necessary to operate a cemetery. Such a purchaser would not pay more for it than for other comparable property, not now devoted to cemetery purposes, that it could convert to such use.
In New York Central R. R. Co. v. Maloney (234 N.Y. 208, 218) the following statement was made concerning quarry property: "The question in such a case is not merely whether *52 the property is peculiarly adapted for the special use claimed for it, even with deposits * * * such as have been enumerated, but whether or not purchasers can be found who would pay more for it because of the adaptability to the use to which the same might be applied." In Sparkill Realty Corp v. State of New York (268 N.Y. 192), where quarry land had been valued upon a capitalization of anticipated profits, this court said (p. 198): "this award was made upon a conclusion conjectured from data founded only in speculation." In Laureldale Cemetery Co. v. Reading Co. (303 Pa. 315, 324) the Pennsylvania court held: "We find nothing in this case which justified the application of an exceptional measure of damages to the land appropriated. The market value measure of damages meets all the requirements of just compensation in this case, for if any piece of land possesses attributes that stimulate competition for its ownership, this affects its market value favorably. If there is no competition for its ownership, trial judges cannot permit values to be increased in the courtroom by a calculation based on anticipated profits, for it is a common experience that there is a painful gap between profits anticipated and profits realized." In George Washington Mem. Park Cemetery Assn. v. Memorial Development Corp. (141 N. J. Eq. 47, 60) the New Jersey court said: "The cemetery permit cost $50,000. The land $85,000. I fail to see by what feat of legerdemain a combination of the two, ipso facto, increases the value of the land, in its natural and unimproved state, as of the date of conveyance, to $1,000,000 or better."
The claimant introduced no evidence concerning what a willing buyer would pay for cemetery lots of this nature in the aggregate, nor was evidence introduced to show what land was available for cemetery purposes in the Albany area and at what prices. Consequently the record lacks essential evidence on which to base an award. The estimated selling price of individual lots over a long period of years, if admissible at all, could not furnish the sole measure of damage. In Nichols on Eminent Domain (Vol. 4, § 12.3142, subd. [1]) the subject of value for potential building sites is analyzed. The author states concerning this question, which is identical with the one presented on this appeal: "It is well settled that if land is so situated that it is actually available for building purposes, its value for such purposes may be considered, even if it is used *53 as a farm or is covered with brush and boulders.[1] The measure of compensation is not, however, the aggregate of the prices of the lots into which the tract could be best divided, since the expense of cleaning off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, and holding it and paying taxes and interest until all the lots are disposed of cannot be ignored and is too uncertain and conjectural to be computed.[2]The measure of compensation is the market value of the land as a whole, taking into consideration its value for building purposes if that is its most available use." (Italics supplied.)
The good will or ecclesiastical approval of this cemetery is not an element of damage in condemnation proceedings (Banner Milling Co. v. State of New York, 240 N.Y. 533, cert. denied 269 U. S. 582).
Other cases have held that evidence of profits, while competent to show an adequate or best use, may not be employed to increase the value of the subject property, inasmuch as the good will and management on which they are based may well be transferred to the conduct of the business or activity elsewhere (Humbert v. State of New York, 278 App. Div. 1041, affd. 303 N.Y. 929; Burdick v. State of New York, 276 App. Div. 1052, affd. 302 N.Y. 670).
When this diocesan cemetery is filled, as eventually it will be, at whatever future date, other property will be acquired for the burial of communicants in Roman Catholic parishes in the Diocese of Albany. The time when that will be done is accelerated in some degree by this appropriation. The extent of the loss to the cemetery is materially affected by the cost and whatever difficulties may be attendant upon the acquisition of other suitable cemetery property in Albany County. The quantity of land which is available for cemetery purposes has become limited in metropolitan areas, which has its effect upon the value of land in such vicinities that is already laid out for cemetery purposes. The value of land of that character is less, *54 where the supply of it is greater. The defect in the order appealed from consists in the refusal to recognize this important factor as bearing upon the value of the land taken. There is testimony by one witness that land is not available in the immediate vicinity, but that does not answer whether potential cemetery property in the Albany area as a whole is scarce or plentiful, costly or cheap.
Moreover, claimant was not entitled to resort to any other measure of value than market value unless and until it had established that there is no market value (Hughes Tool Co. v. United Artists Corp., 279 App. Div. 417, 423-424, affd. 304 N.Y. 942; Matter of Board of Water Supply, 277 N.Y. 452; Heiman v. Bishop, 272 N.Y. 83).
In the absence of such evidence, the judgment appealed from should be reversed and a new trial granted.
Judgment affirmed.
NOTES
[1] Citing Matter of Daly v. Smith (18 App. Div. 194); Matter of Simmons (141 App. Div. 120, affd. 202 N.Y. 606); St. Albans Land Corp. v. State of New York (254 App. Div. 395).
[2] Citing Matter of Daly v. Smith (18 App. Div. 194); Matter of Simmons (66 Misc. 204). [In Matter of Simmons, 141 App. Div. 120, affd. 202 N.Y. 606, the Appellate Division found that all of the lots were then presently saleable.]